# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2969-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.F.-B.,

     Defendant-Appellant,

and

T.P.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.P.,
a minor.

_____

Argued April 3, 2025 – Decided April 14, 2025

Before Judges Natali, Walcott-Henderson, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0121-20.

Meghan K. Gulczynski, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Meghan K. Gulczynski, of counsel and on the briefs).

Mary L. Harpster, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Mary L. Harpster, on the brief).

Julie E. Goldstein, Assistant Deputy Public Defender, argued the cause for minor J.P. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, of counsel and on the brief).

PER CURIAM

Defendant K.F.-B.[1] is the biological parent of J.P. Defendant appeals from the court's May 12, 2023 order terminating her parental rights to her daughter J.P. She contends the court erred in finding that it was in her daughter's best interests to be adopted by her paternal aunt and uncle, M.H. and R.H., with

---

[1] We use initials to identify the parties and child to protect the child's privacy and because records relating to Division proceedings held pursuant to Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

whom J.P. has resided since 2018.  The Law Guardian supports the termination on appeal as it did before the court.[2]

Based on our review of the record and applicable law, we are satisfied the evidence in favor of the guardianship petition supports the court's decision to terminate defendant's parental rights.  Accordingly, we affirm substantially for the reasons set forth by the court in its thorough oral decision rendered on April 26 and May 12, 2023.

We will not recite in detail the history of the Division of Child Protection and Permanency's (Division) interactions with defendant and J.P.  Instead, we incorporate by reference the factual findings and legal conclusions contained in the court's decision.

The guardianship petition was tried before the court on various dates between September 13, 2022, and January 19, 2023.  The Division presented overwhelming evidence that established, by clear and convincing evidence, all four statutory prongs outlined in N.J.S.A. 30:4C-15.1(a).  In its thorough decision, the court concluded termination of defendant's parental rights was in J.P.'s best interests and fully explained the basis for each of its determinations.

---

[2]  J.P.'s biological father, T.P., executed an identified surrender of his parental rights and has not participated in this appeal.

A-2969-22

Our review of a court's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012). "A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015) (citing F.M., 211 N.J. at 448). Our Supreme Court has noted in respect to termination of parental rights cases, "a trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448. This enhanced deference is particularly appropriate where the court's findings are founded upon the credibility of the witnesses' testimony. N.J. Div. of Youth & Fam. Servs. v. H.B., 375 N.J. Super. 148, 172 (App. Div. 2005) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). No deference is given to the court's "interpretation of the law," which we review de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

Viewed through this prism, we affirm the court's decision to terminate defendant's parental rights. As we have noted, we do so for the cogent reasons extensively set forth in the court's oral decision. We add additional comments by way of amplification.

The record clearly supports the judge's findings on prongs one and two of the statutory criteria. N.J.S.A. 30:4C-15.1(a)(1) and (2). Contrary to defendant's representations, the record was replete with evidence that she had made specious allegations of sexual abuse against T.P.; coached J.P. to make further allegations which experts recognized as rehearsed; and attempted to stop visitation between T.P. and J.P. Notably, in so doing, defendant was not merely the victim of her anxiety and acting out of understandable protectiveness towards J.P., but proactively sought to undermine J.P.'s relationship with T.P.

A-2969-22

until in 2016, when she needed a place to live and turned to T.P. During that time, she managed to cease making allegations against him for an entire year.

Moreover, the record reflects that, notwithstanding years of therapy with multiple professionals, defendant had not gained any insight into the harmfulness of her behavior. Rather, despite the amelioration of her anxiety, and despite all evidence to the contrary, she continued to harbor the belief that T.P. had abused J.P. Because of this, defendant still posed a risk of harm to J.P., and none of the experts in this case, save one whom the court justifiably deemed incredible, recommended reunification at this time or in the foreseeable future.

The record also does not bear out defendant's claim that J.P.'s documented stress and anxiety actually arose, not from defendant's actions, but from her separation from defendant. Numerous professionals linked J.P.'s mental health struggles to defendant's coercive actions and determined that J.P. did not see defendant as her protector. J.P. believed she had gotten both of her parents in trouble, blamed herself for the present situation, and, as one testifying expert put it, continued to "suffer inwardly." Nonetheless, J.P. has thrived, physically and mentally, since being placed with her paternal aunt and uncle.

Additionally, contrary to defendant's representations, her refusal to accept J.P.'s retraction of the sexual abuse allegations did not reflect a prioritization of

A-2969-22

J.P.'s safety. Rather, as another testifying expert noted, by choosing to maintain her belief in J.P.'s allegations, defendant was essentially exonerating herself and laying all the blame for the removal and litigation on J.P. Defendant's testimony that she did not blame J.P. for her loss of custody did not change this. Moreover, defendant's insistence that J.P. told her the truth demonstrates, as the court noted, that defendant still sees T.P. as a sexual predator and undermines her claim that she would allow J.P. to see T.P. in the future.

Further, while defendant's apparently immutable personal beliefs and thoughts regarding T.P. may not have informed her more recent behavior, this was only because her visitation was largely supervised, and she knew it was in her interests to refrain from acting on her beliefs when faced with the possible termination of her parental rights. While defendant insisted at trial that she would allow J.P. to visit with T.P. if she were reunited with her daughter, she also admitted that she still did not trust T.P. and if any abuse allegations arose in the future, she would not consult the Division but would take J.P. and move away. As the court noted, the threat to J.P.'s cherished bond with T.P. could not be clearer.

Finally, the Division did not harm J.P. by failing to reunite her with defendant; rather, it was defendant's inability or unwillingness to overcome her

7

mental illness and delusions that resulted in J.P.'s prolonged placement with her resource family, where she is thriving. And, in fact, it was the stability J.P. had achieved through the support of her resource family that allowed her to develop better relationships with both of her parents than she otherwise would have had.

Turning to prong three, N.J.S.A. 30:4C-15.1(a)(3), we concur with the court that the Division has offered both parents reasonable services, including programs and visitations. Contrary to defendant's contentions, the Division's sole goal in providing her with therapy was to assist her in gaining insight as to: (1) how her anxiety prompted her to make unfounded, delusional accusations of sexual abuse against T.P. and subsequently coach J.P. into making her own baseless allegations; and (2) how these numerous allegations had the capacity to affect J.P.'s development and needlessly destroy her relationship with T.P. After years of appropriate therapy, however, defendant failed to gain that insight. As was noted by the court, she was not always forthcoming with her providers.

Additionally, although defendant blames the Division for failing to foster a relationship between her and M.H. such that kinship legal guardianship (KLG) might have been more feasible, defendant ignores: (1) M.H. had every reason to be leery of defendant given the baseless accusations against her brother, T.P.; (2) M.H. had to deal with the emotional repercussions of defendant's actions

8

while caring for J.P.; and (3) defendant could have reached out to M.H. on her own.

Further, while defendant maintains the court should not have relied solely on M.H.'s preference for adoption in terminating her parental rights, this is not what occurred. Defendant wanted KLG because it served her interests. The court determined that adoption was the better path for J.P. because: (1) J.P. had spent years with and wanted to stay with her resource family; (2) J.P. saw her resource parents as her psychological parents; (3) the resource parents wanted to adopt her; (4) remaining with the resource family allowed J.P. to see both her parents; (5) J.P. needed to move on with her life without Division involvement to have a sense of security and permanency; and (6) with KLG, there was a risk that defendant would file motions and perpetuate litigation.

As to prong four, N.J.S.A. 30:4C-15.1(a)(4), there is abundant evidence in the record to support the court's conclusion termination would not do J.P. more harm than good. The court was entitled to rely upon J.P.'s expressed preference to be adopted by M.H. and R.H., which was consistently expressed to a variety of evaluators over a number of years. Additionally, numerous evaluators concurred that termination of defendant's parental rights would not do more harm than good. These evaluators simply cautioned that J.P. would

A-2969-22

suffer harm if she were not permitted to continue visiting with defendant.  The court was entitled to rely upon M.H.'s representations that she had no intention to keep J.P. from defendant and that she would facilitate continued visitation.

Children like J.P. are entitled to a permanent, safe, and secure home.  We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child."  N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).  As public policy increasingly focuses on a child's need for permanency, "[t]he emphasis has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being."  Ibid.  That is because "[a] child cannot be held prisoner of the rights of others, even those of his or her parents.  Children have their own rights, including the right to a permanent, safe and stable placement."  Ibid.

The question then is "whether the parent can become fit in time to meet the needs of the children."  N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 263 (App. Div. 2005); see also P.P., 180 N.J. at 512 (indicating that even if a parent is trying to change, a child cannot wait indefinitely).  After carefully considering the evidence, the court reasonably determined that

defendant was unable to parent J.P. and would not be able to do so for the foreseeable future. Under those circumstances, we agree with the court that any further delay of permanent placement would not be in J.P.'s best interests.

To the extent we have not expressly addressed any issues raised by defendant, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-2969-22